CASE No. 904.

## LYNCH v. HANCOCK.

1. Where seven bonds are secured by mortgage, the surety, upon paying one of them to its assignee, becomes subrogated to all the rights of the assignee, and as such is, in equity, the assignee of a proportionate part of the mortgage, with the mortgagee as his trustee.
2. After mortgage executed the premises were sold to H., and H. agreed to convey to R., and subsequently one of the mortgagees (there being two) entered in the office of records, without the knowledge of such assignee or the surety, a discharge of the lien of the mortgage, and afterwards R. agreed to convey to A. and J. *Held*, that such entry did not affect the right of the assignee or of the surety to enforce the mortgage upon the property in the possession of H. or of R., or even of A. and J.

April Term, 1880.

3. One of the mortgagees could not, in such case, release the lien of the mortgage; and as the record of the mortgage showed that there were two mortgagees, and seven separate bonds secured thereby, there was enough to put subsequent purchasers upon the inquiry, and thus charge them with notice of the assignment.

4. If A purchased land in 1863 and gave his mortgage deed, contracting with reference to confederate money, an offer to pay in confederate currency in January, 1864, the amount due, is not an offer to pay the amount secured by the contract, nor a legal tender of the debt; and the lien of the mortgage would not be thereby destroyed.

5. An entry in the book of records in the proper office that the lien of a mortgage has been released, cannot operate to make the possession of subsequent purchasers from the mortgagor adverse to the claim of one entitled in equity to the security of such mortgage; and more particularly not until notice of the entry is had by such claimant.

6. Mere possession for the statutory period by a purchaser from the mortgagor, with notice of the mortgage, will not constitute a bar to the action for foreclosure. *Norton* v. *Lewis*, 3 *S. C.* 25, recognized and followed.

7. Spreading upon the records a notice that the lien of a mortgage has been discharged, is not constructive notice, for it is not within the terms of Chapter LXXXII., Section 20, of the general statutes, and not such a paper as is required by law to be recorded.

8. Adverse possession cannot be asserted against a mortgage where the necessary statutory period includes the years when the stay law was of force.

9. The plea of purchaser for valuable consideration without notice, cannot avail unless the party has both paid the purchase money and acquired the legal title before notice of the outstanding encumbrance or equity.

10. Where a surety gives his note in payment of the debt, he is not entitled to recover the amount of the note from his principal, unless he shows that the note has been paid, or that he has the means to pay it.

11. A payment of the debt by a surety after his principal's death, is a good set-off in an action brought by the executor of the principal upon an obligation of the surety to the principal.

12. Where the mortgaged premises are held by several purchasers, in different rights, acquired at different times, the several parcels must be sold in the inverse order of the sales by mortgagor. *Norton* v. *Lewis*, 3 *S. C.* 25.

---

Before PRESSLEY, J., Richland, November, 1878.

This was a bill in equity, filed by John Bauskett, in February, 1867, to foreclose a mortgage given him by Lana J. Hancock, in 1856, to which bill James M. Rhett, E. J. Arthur and L. D. Childs, subsequent purchasers from the mortgagor, were made parties defendant. These defendants answered. Some testimony was taken, but before a hearing, Bauskett died in 1867,

and E. J. Arthur died in March, 1868. John Lynch and Sophia Bauskett, as qualified executors of John Bauskett, filed their bill of revivor against William Martin and Martha Arthur, executors of E. J. Arthur, and against Hancock and Childs. Subsequently, Lynch, plaintiff, (Sophia Bauskett having died) under leave of court, filed his amended complaint against the heirs of Arthur, and the heirs of R. M. Johnston, (who died in 1868, and who, it was ascertained, was, instead of Childs, the joint purchaser with Arthur,) and also against Thomas B. Wadlington, who claimed to hold a mortgage prior in time to the Hancock mortgage. Wadlington filed his answer in July, 1875, asserting his prior mortgage. Again, in October, 1875, under order of the court, James F. Sims, then in possession of a part of the mortgaged premises, which he claimed under a tax title, the date of which is not stated, was made a party defendant.

The agreement between Hancock and Rhett was as follows :

" Articles of agreement between Dr. L. J. Hancock and James M. Rhett. Dr. Hancock agrees to sell James M. Rhett his plantation, three and a half miles from Columbia, containing 1500 acres, more or less, for the sum of twenty-seven thousand and five hundred dollars, payable in equal installments, the first in two years from date, the balance in three installments, payable in three, four and five years from date, and Mr. Rhett to have the privilege of paying the bond, or any part of it, at any time he may wish to. The interest to be paid annually. Should the land prove less than 1500 acres, it is to be paid for at the same rate. The plantation to be delivered in the next two or three days, Dr. Hancock to make good titles in the next ten days, and to pay expenses of papers. James M. Rhett agrees to purchase the above mentioned plantation on terms as stated above, and to secure Dr. Hancock's payments by bonds and mortgage of the plantation and endorsement by Maj. Roland Rhett.

" Columbia, 21st March, 1863.

    (Signed)                    " L. J. HANCOCK.

                        · " JAS. M. RHETT.

" Witness—CHARLES H. RHETT."

All the issues of law and fact were referred to James H. Rion, Esq., as special referee, who made the following report:

After hearing argument of counsel and a consideration of all the evidence, I find as matters of fact—

## A.

1. That on January 2d, 1854, Samuel Fair and J. Foster Marshall conveyed to John Bauskett, eighteen hundred and ninety-nine acres of land, for which Bauskett executed to them seven bonds, signed by himself as principal, and Thomas B. Wadlington as surety, and gave a mortgage of the land to secure the payment of the bonds, which was duly recorded.

2. That the entire interest in the said bonds and mortgage became vested in Samuel Fair.

3. That Bauskett died A. D. 1867, having paid all of the said bonds except the one first due, to wit, January 1st, 1855, and another due January 1st, 1859.

4. That prior to January 1st, 1855, Fair assigned the bond due January 1st, 1855, to one Gerhard Muller, guaranteeing the payment of the same, without mention of the mortgage.

5. Suit was instituted on the bond due January 1st, 1859, against Bauskett and Wadlington, and judgment by confession obtained against Bauskett only, on March 2d, 1867.

6. That on April 14th, 1863, the following was endorsed on the mortgage: " The lien and legal effect of the within mortgage is hereby released and discharged forever. Samuel Fair, for Fair and Marshall. This April 14th, 1863, in presence of James A. Black;" which endorsement was recorded in the same office in which the mortgage was recorded.

7. That in April, 1871, Muller sued Wadlington on the assigned bond and obtained judgment thereon.

8. That on appeal, the Supreme Court of this state, at April Term, 1874, (5 *S. C.* 347), affirmed the judgment, holding that upon the facts hereinbefore stated, Wadlington was not released from his liability as surety.

9. That on October 9th, 1874, Muller assigned to Wadlington all his right, title and interest in the mortgage, for Wadlington to hold and use, for enforcing the payment of the bond, and for his indemnity as surety.

10. That on April 13th, 1875, Wadlington paid Muller $3671.01, in full satisfaction of the aforesaid judgment, of which $127.10 was costs.

11. That on January 10th, 1856, Bauskett conveyed the aforesaid land to Lana J. Hancock.

12. That on March 21st, 1863, Hancock contracted to sell fifteen hundred acres, *more* or less, of the said tract of land to James M. Rhett, under which contract of sale Rhett entered into possession; and on January 19th, 1864, he, Rhett, sold the fifteen hundred acres, more or less, as fifteen hundred and fifty-four acres, to Rufus M. Johnston and Edward J. Arthur, who then went into possession of the land and held the same until their deaths.

13. That Arthur died February 27th 1868, and Johnston died April 20th, 1869, and since their deaths their heirs (defendants in this case) have held possession of the said fifteen hundred and fifty-four acres as tenants in common.

14. That the remaining three hundred and forty-five acres, more or less, is now held under a tax title by James C. F. Sims, son-in-law of Hancock, said land having been sold for taxes assessed thereon as the property of Hancock.

Upon the foregoing facts Wadlington, who is brought in as party defendant by Bauskett's executor, the plaintiff, in a bill to foreclose a mortgage upon the land mentioned, given by Hancock to Bauskett, seeks to foreclose the mortgage given by Bauskett to Fair and Marshall.

The assignment of the mortgage by Muller to Wadlington was a nugatory act. By *the payment of the bond* upon which he was surety, Wadlington became at once vested with a right of action upon the bond against Bauskett, and entitled to all the benefits of the mortgage given by Bauskett.

To the prayer of foreclosure three defences are set up—

*First.* That the lien of the mortgage was released by Fair. This I overrule as having been decided by the Supreme Court in Muller *v.* Wadlington.

*Second.* Adverse possession for ten years. I overrule this on independent grounds.

1. Wadlington's rights, as above ruled, do not come *through*

*Muller*, but are the consequences of his paying the bond upon which he was surety.  Hence *his* right of action only accrued on April 13th, 1875.

2. Wadlington was made a party to the bill on July 18th, 1875.  Hancock's adverse possession cannot be connected with, or (prior to the code) benefit subsequent grantees.  Neither Sims nor Rhett held for ten years.  Arthur and Johnston and their heirs (whose adverse possession can be connected) held from January 19th, 1864, to July 18th, 1875, ten years and seven months.  But in the foreclosure of a mortgage the administrator or executor is a necessary party, for in their possession are the evidences, if any, of payment, and it is their duty to relieve the land of any encumbrance out of the personal assets, if any.  Hence any court would ignore the rights of the heirs of decedent (often minors) by granting a decree of foreclosure without the administrator or executor being brought into court as a party.  But no suit can be brought for nine months after decedent's death against an administrator or executor.  Hence, for nine months the possession was not adverse, but protected by the statute.  This leaves only nine years and ten months adverse possession.

3. Again, from December 21st, 1861, to December 21st, 1866, the operation of the statute of limitations was suspended as applicable to all actions for the collection of money; hence, for two years and eleven months no action could have been brought to collect the amount due on the bond by a foreclosure at law or in equity.  This leaves less than ten years.

4. Arthur and Johnston and their heirs, if purchasers from mortgagor out of possession but with notice of the mortgage, cannot avail themselves of the defence of the statute, unless they did some act of express open defiance to the claimants under the mortgage.  *Norton* v. *Lewis*, 3 *S. C.* 31.

I hold (*subter*) that they had such notice, and that no such act was proven.

*Third.*  The third defence is, that all the parties interested in the land since the release by Fair (April 14th, 1863,) are "subsequent purchasers without notice of the mortgage to Fair and Marshall."

It is contended by the counsel for Wadlington that Fair had

no authority to execute a release for Marshall, and that the release was not in form legally sufficient. I hold that as no one has, on the part of Marshall, up to this day, disputed Fair's authority, he had such authority. The arguments of counsel and the authorities cited are all applicable to the *release of a debt.* This was not a release of the debt, but merely a declaration of, or an agreement for, the *surrender of a security.* This, I hold, can be done without consideration or any formality, *as to third parties;* who became subsequent purchasers of the property affected by the security. A mere verbal declaration in unambiguous terms by a mortgagee, that his mortgage debt is paid, satisfied, or released, or that he releases, waives or surrenders his security, will *estop* him from afterwards setting up his mortgage against those who, on the faith of his declaration, became purchasers of the property.

But what was the extent of this release and of what did it give notice ? It is to be presumed that all parties had notice of the recorded mortgage. For the purposes of this case I give all parties the benefit of holding that they had actual notice of the entry by Fair on the mortgage. The whole question is then resolved into an inquiry as to the extent of this notice. All parties had notice that the mortgage was a security for *seven* different bonds. Hence the entry of release was a notice to the effect that Fair on April 14th, 1863, released the security to the full extent of *his interest* in that security, which was commensurate with his interest in the *seven bonds,* to secure which the mortgage was given. At this date *one* of these bonds was held by Fair unpaid. The mortgage was released as to this. But *one* was held by Muller, and in the latter he held no interest, and consequently he had no authority to release the security as to that bond. Hence those who became subsequent purchasers on the faith of the notice of release, assumed the risk, *first,* of Fair not having authority to release for Marshall; and *second,* of his having parted with his interest in some of the bonds; and events have proven that their second risk was unfortunately assumed. In my opinion the foregoing is fully sustained by the decision in Muller *v.* Wadlington, and in fact almost parodies the reasons in that case. It is true the court in that case disclaimed

precluding purchasers of the land from setting up defences, but the decision itself precluded them from setting up that Fair had authority to release the security of the mortgage *quoad* the bond assigned to Muller.

I therefore hold as matters of law—

1. Fair's release was valid to the extent of the interest he had in the then unpaid bonds.

2. The lien of the mortgage was not released *quoad* the bond assigned to Muller.

3. That Wadlington's rights arose from and upon his payment of the bond upon which he was surety.

4. That neither Hancock nor any subsequent purchaser of the land are purchasers without notice of the mortgage by Bauskett to Marshall and Fair being in force *quoad* the bond assigned to Muller.

5. That the defence of ten years adverse possession cannot be successfully set up by any of the parties to this suit.

And in this behalf I recommend that it be adjudged and decreed by the court that the plaintiff, as executor of Bauskett, is indebted to the defendant Wadlington in the sum of $3435.91, with interest thereon from April 13th, 1875; and that unless the sum be paid on a day stated, that the whole tract of land conveyed to Bauskett and by him to Hancock, be sold on terms and in manner usual in foreclosure sales, the tract now in possession of Sims first, and the proceeds of sales being insufficient to satisfy the debt and costs, then the tract now in possession of the heirs of Johnston and Arthur, in such parcels as the counsel for the parties may agree, until sufficient be realized.

### B.

As to that branch of the suit which relates to the prayer of the plaintiff as executor of Bauskett, to foreclose the mortgage given his testator by the defendant Hancock.

I find as matters of fact—

1. That on January 10th, 1856, John Bauskett conveyed eighteen hundred and ninety-nine acres of land to Laua J. Hancock, in payment of which Hancock gave ten bonds for $3000 each, payable in one, two, three, four, five, six, seven,

eight, nine and ten years respectively, all secured by a mortgage of the land, which mortgage was duly recorded.

2. That on March 21st, 1863, Hancock contracted to sell fifteen hundred acres, more or less, of this land to James M. Rhett, under which contract of sale Rhett went into possession, and on January 19th, 1864, he, Rhett, sold the fifteen hundred acres, more or less, as fifteen hundred and fifty-four acres to Rufus M. Johnston and Edward J. Arthur, who then went into possession of the land and held the same until their deaths.

3. That Arthur died February 27th, 1868, and Johnston died April 20th, 1869, and since their deaths, their heirs (defendants in this case) have held possession of the said fifteen hundred and fifty-four acres as tenants in common.

4. That the remaining three hundred and forty-five acres, more or less, is now held under a tax title by James C. F. Sims, son-in-law of Hancock, said land having been sold for taxes assessed thereon as the property of Hancock.

5. That after the contract between Hancock and Rhett, and before the sale by Rhett to Arthur and Johnston, Bauskett expressed his willingness to Arthur, in his capacity at that time of attorney for Rhett, at any moment to release his mortgage and mark it satisfied. During the same interval Bauskett declared, in the presence of Hancock, that he did not know that he, Bauskett, had any claim against the land.

6. That Bauskett and Hancock had divers and numerous mutual money and business transactions with each other besides the land purchase, from the date of said conveyance up to the death of Bauskett, during the whole of which period Bauskett was the regular confidential legal adviser of Hancock.

7. That Bauskett and Hancock, in their said mutual money and business transactions during the civil war, recognized confederate notes and values of articles furnished at prices estimated in confederate notes as if the same had been in legal currency.

8. That in stating the account between Bauskett and Hancock—

*a.* I charge Hancock with the mortgage bonds, $30,000, with interest payable annually from January 10th, 1856.

*b.* I charge Hancock with the following notes.    *    *    *

*c.* I charge Bauskett with $1000 collected on note of Robert N. Lewis, with interest from January 1st, 1863.

*d.* I charge Bauskett with the amount of the Kirkland bond, $10,000, with interest payable annually from April 15th, 1864.

*e.* I charge Bauskett with the following items.  *  *  *

I finding the aforesaid items of indebtedness to exist and to be unpaid as matters of fact; but more specifically—

9. I find that Hancock gave Bauskett the note on Lewis of $1000 to collect, which note is unacccounted for by Bauskett or his executor.

10. I also find that the bond of Bauskett with Hancock as surety to Mrs. Kirkland, was not paid by Bauskett in his lifetime; that after Bauskett's death, to wit, on September 26th, 1873, Hancock became the owner thereof for value, to wit, by giving his note for $10,000 and the interest to J. C. F. Sims, whom I find to have been the holder and owner thereof from some date subsequent to August, 1872, the time of Mrs. Kirkland's death.

In this accounting, the statute of limitations is set up against the items of discount offered by Hancock, and the notes and due-bills offered by plaintiff.

I overrule the plea on both sides for the reason of the continued contemporaneous mutual dealings between the parties as proven.

Objection is made to insufficient notice of these opposite claims having been given, and as to some not having been properly pleaded; I overrule this on the ground that at this reference any of the parties were at liberty to offer proof against any item, and that from February 9th, 1876, to July 21st, 1877, afforded ample time to recover from any surprise and enable all parties to hunt up and produce proof.

The Lewis note I allow not as proven to be collected; but being unaccounted for by Bauskett or his executor, I presume its collection.

The Kirkland bond I allow on the ground that since September, 1873, Hancock has held this bond, and his ownership has been undisputed to this date, near four years. His payment of

the same by his note is good payment, being accepted as such by the owner and holder of the bond.

The payment of the bond by Hancock, after the death of Bauskett, would not authorize him to set the same up as a set-off were it not that he paid it *as surety* for the testator. This constituted the fruition of a credit given by Hancock to Bauskett at the time of the execution of the bond, by his becoming surety thereon for Bauskett. A *contract* was *then* entered into by Bauskett that if Hancock would become his surety on the bond, he Bauskett, his heirs, executors and administrators, would, in event Hancock ever had to pay the bond, repay the amount so paid.

I therefore find as matters of law—

1. That the plea of the statute of limitations cannot be successfully set up by either party to any item of the accounting.

2. That proof or disproof of any of the items was admissible as of the date of July 21st, 1877.

3. That Bauskett's estate is liable for the value of the Lewis note on failure to account for its non-production.

4. That Hancock is to be presumed to have become holder and owner of the Kirkland bond rightfully on account of the length of time the ownership has been undisputed by those interested so to do, and he being surety.

5. That Hancock's payment by his note is a valid payment, having been accepted as such.

6. That his payment *as surety*, though after testator's death, entitled Hancock to set up the amount so paid as a set-off.

7. That Hancock is not indebted to the estate of Bauskett in any amount, on the mortgage bond or otherwise.

8. That the estate of Bauskett is indebted to Hancock in the sum of $4967.52, with interest thereon from September 26th, 1873.

To the prayer for foreclosure, the same defendants set up the same defence of ten years adverse possession, which I overrule for some of the reasons hereinbefore given as regards the Fair and Marshall mortgage (2, 3 and 4.)

The same defendants also set up the defence of subsequent purchasers without notice of the mortgage. This I sustain upon

the fifth finding of fact herein, and for reasons given as to how informally a party may release the security of a mortgage as to third parties when discussing the question of the release by Fair.

I therefore further find as matters of law—

9. That the defence of ten years adverse possession cannot be successfully maintained by any of the parties to this suit.

10. That Johnston and Arthur were subsequent purchasers without notice of the mortgage to Bauskett, being a subsisting lien or encumbrance upon the land purchased.

In neither view of the question, then, as having an unsatisfied mortgage debt, or having subsequent purchasers with notice in possession of the land mortgaged, is the executor of Bauskett entitled to the prayer of his bill or complaint.

I therefore recommend that the court adjudge and decree that the prayer of plaintiff for a foreclosure be not granted.

As to the question of costs, I recommend that as nearly an equitable adjustment as possible, (besides being the only one not merely nominal,) in this very complicated cause, the court orders all the costs be paid out of the proceeds of such land as may be sold under decree made in this cause.

All which is respectfully submitted.

The case was heard by the Circuit Court upon exceptions to this report, and the following decree was filed :

This case involves the foreclosure of two mortgages, on which the referee has reported separately. He sustains the claim of T. B. Wadlington who holds a bond amounting to $3435.91, with interest from April 13th, 1875. It is one of seven, dated January 2d, 1854, by John Bauskett, with Wadlington as surety, to Samuel Fair and J. Foster Marshall, secured by mortgage duly recorded. Marshall transferred his share to Fair, but did not in writing assign the mortgage; it remained of record to both of them. In 1854, Fair sold one of said bonds to Gerhard Muller, to whom Bauskett paid the interest several years.

After his death, (insolvent,) Muller compelled Wadlington, the surety, to pay that bond, and he now claims repayment out of the mortgaged property. Meanwhile, on April 14th, 1863,

Fair had surrendered the mortgage to Bauskett, having first endorsed thereon for Fair and Marshall that its " lien and legal effect was thereby released and discharged forever." This release was recorded, and now Hancock, who purchased the mortgaged land from Bauskett, in January, 1856, and the heirs of Arthur and Johnston, who claimed to have purchased in January, 1864, resist the mortgage, alleging the validity of the said release. I agree with the referee that it cannot avail them. Hancock cannot claim its benefit, because his ·purchase was long before the release, and he has not attempted to prove that he then relied on any promise to obtain such release, or that he ever required one as precedent to his paying the purchase money.

As to Arthur and Johnston, I hold that the irregularity of the said release was sufficient to cause them to inquire whether Fair held all the bonds secured by the said mortgage. It secured the purchase money of land which had been sold by Fair and Marshall as tenants in common. That was express notice of the nature of Marshall's interest in the bonds, and the record did not show any assignment of that interest. He, too, as holding part of the legal title in the mortgage, was trustee with Fair for Muller. In that condition of the record no purchaser should have relied upon a release made by Fair for Fair and Marshall without requiring him to show his authority. Failing to require this, the party so negligent must bear the loss, if any, which it occasioned. The heirs of Arthur and Johnston further claim the mortgaged property by possession, but allege no notice of its adverse character except the record of the said release.

I hold that Muller will not be presumed to have had notice of that record. He had purchased his bond long before that time, and the obligor had been notified of the said purchase and was then paying the interest to Muller. He therefore could have had no motive or occasion to examine the record in respect of the said mortgage, nor is there any requirement of the registry law imposing such duty. The said release so recorded was not, therefore, any notice to Muller that the mortgagor or his assigns held possession of the land adversely to the mortgage ; as against a

mortgagee notice of adverse possession should be unmistakable and clearly proved.

But if the said defendants had even proved the adverse character of their possession, its period is too short to sustain their claim. Their alleged purchase was in January, 1864; then the stay law prevented suits on such bonds. That stay continued until December 21st, 1866, and from that time until January, 1875, when Wadlington was made a party to this suit, was too short a period to perfect their adverse possession. In the matter of Hancock's mortgage to Bauskett, who is dead, the referee has erred in admitting the testimony of Hancock and the declarations of Arthur. They prove transactions with the deceased or declarations by him, and such proof by interested parties is incompetent. If their testimony be stricken out, as it must be, there remains no proof whatever that Bauskett ever agreed to receive payment from Hancock in supplies at their price in confederate money. Nor is there proof as to what amount of supplies Hancock delivered. Hall's testimony on that head is very vague, and he also proves that Bauskett was "not to pay the market price." Nor is there any proof to warrant the charge against Bauskett of $1000 on the Lewis note. That and all other discounts, if properly proved hereafter, should be credited on Hancock's mortgage at their value in legal currency. Only Roland and Charles Rhett prove that Bauskett at one time consented to discharge said mortgage for confederate money. The time of that consent must have been soon after March 21st, 1863, when James Rhett contracted to buy fifteen hundred acres of the mortgaged land, and the moderate price which he was then to pay for the same in confederate money, clearly proves that it was still available for investment. The consent of Bauskett to receive it at that time is therefore no proof of his agreement to accept such payment afterwards, when that currency had become less than one-fourth of its value in 1863. But the testimony of Charles and Roland Rhett is also, with the letter of Bauskett dated January 27th, 1864, relied on to prove an admission by Bauskett, that nearly all the Hancock debt had then been paid. The Rhetts prove that both Hancock and Bauskett then refused to receive confederate money, each excusing himself by saying it

was to go to the other. Bauskett's letter does not indicate what balance was due to him on his mortgage; it simply required the Rhetts to execute their bonds and mortgage according to contract, and offers to satisfy his mortgage without indicating what portion of the Rhett bonds he was to keep in payment of the balance due to him.

On April 15th, 1863, Hancock became surety for Bauskett on a bond for $10,000 to Rebecca Kirkland, which was unpaid when Bauskett died insolvent. After that Hancock purchased it, and now claims it as a discount in this case.

I hold that at law it could not be so allowed. *Nettles* v. *Huggins*, 8 *Rich. Eq.* 273. But in equity the surety of a mortgagee who is asking a foreclosure of a mortgage will be relieved of his liability as surety before the court will compel him to pay his mortgage. In that case it does not allow as a discount the full amount of the bond, if the surety has already taken it up, for a less sum. He must not use his position as surety to speculate on his principal. *Neal* v. *Sullivan*, 10 *Rich. Eq.* 283; *McKnight* v. *Bradley, Id.* 557.

If, therefore, Sims, who is son-in-law of Hancock, bought the bond for him, the price then paid, with interest, is now the measure of Hancock's equity. And, if that purchase was not for him, the amount which he can now claim credit for in this case is only so much as his own estate was good for when he bought the bond from Sims. The mere giving his note for a larger sum than he could pay will be regarded in this case as only a contrivance between him and Sims to get more than their share of Bauskett's insolvent estate, to the loss of his other creditors; and that equity will not permit.

On March 21st, 1863, James Rhett contracted to buy from Hancock fifteen hundred acres of the mortgaged land for $27,500. He was to give bond with surety and mortgage for the purchase money, with privilege to pay it "at any time he wished." Hancock was to make good title in ten days, but Arthur, as attorney for Rhett, objected to Hancock's title, and the conveyance was never executed. If Rhett's bonds had been delivered, the contract authorized him to pay them in confederate money; but there is no proof that he ever offered any bonds or

was ever willing to accept such title as Hancock could make, at any time before January, 1864. Meanwhile confederate money continually depreciated, and on January 19th, 1864, Rhett sold the land to Arthur and Johnston for $50,000, they waiving the defect of title which he, under Arthur's advice, refused to waive. There is no competent proof that either Bauskett or Hancock knew anything of this sale before it was completed, or that either of them encouraged or assented to it. Arthur's declarations, which were objected to, is the only testimony offered on that point. After the said sale, Rhett tendered payment to Hancock in confederate money, and he refused to receive it. There is no proof that the money so tendered was afterwards deposited anywhere to his order, or that Rhett ever parted with his control over it. Whether he used it for other purposes or whether it finally perished in his hands, does not appear.

I hold that the said tender was not payment, and that the failure of Rhett to place the money beyond his control, made the loss, if any, fall on him.

I further hold that his persistent objection to Hancock's title until the depreciation of the currency made the contract a valuable speculation, deprived Rhett of all just claim to a specific performance thereof. When the contract was made, both the parties were on equal terms, and after contingencies might turn out to the advantage of either one or the other of them; if the war should cease, the currency would rise in value, and in that case Hancock would be the gainer; but if the war continue, then Rhett would gain by the decline of the currency. Each therefore was entitled to have the contract executed immediately. Then Hancock would have surety for its fulfillment if the currency should rise, and Rhett the privilege to pay if it should decline. But he so long objected to the title as to deprive Hancock of his right if the chances had been in his favor, and not until the advantage was clearly on his own side did Rhett waive his said objection. In such case I cannot think that this court should decree a specific performance in his favor, and I therefore adjudge that his claim to the land, and that of Arthur and Johnston, who are his assigns, is invalid.

F

It is ordered and decreed that the plaintiff pay to T. B. Wadlington within sixty days, the sum of $3435.90, with interest from April 13th, 1875. If the same be not so paid, Nathaniel Barnwell, master in equity, is authorized and directed, after usual advertisement, to sell at public sale the tract of land now in the possession of the heirs of E. J. Arthur and R. M. Johnston. The terms of the said sale are one-third cash, balance in two equal annual installments, bearing interest from the day of sale, payable annually, secured by bonds of the purchaser and mortgage of the premises.

Further ordered that the said master apply the proceeds of said sale, first, to pay the costs of this case; next, to pay the amount herein decreed to T. B. Wadlington, and the remainder to the further order of this court on the account to be taken between the plaintiff and Lana J. Hancock.

Further ordered that said master take the testimony and report the said account, excluding the evidence of the defendant Hancock and allowing him all proper credits at their value in legal currency, according to the principles hereinbefore stated.

The plaintiffs, defendant Hancock and the heirs of Arthur and Johnston, appealed to this court upon the grounds considered in the opinion of the court.

*Mr. F. W. McMaster*, for plaintiff.

*Messrs. Wm. Wallace* and *Bachman & Youmans*, for Hancock.

*Messrs. Melton & Clark*, for heirs of Arthur and Johnston.

August 25th, 1880. The opinion of the court was delivered by

McIVER, A. J. A brief statement of the leading facts of this case will be necessary to a proper understanding of the questions to be considered.

The land which is the subject matter of this suit, was sold by Fair and Marshall to Bauskett on January 2d, 1854, and to secure the payment of the purchase money the latter gave to the former seven bonds secured by a mortgage of the premises, which was

·duly recorded. The entire interest in these bonds and this mortgage became vested in Fair, but how, or when this was ·effected does not appear. Prior to January 1st, 1855, Fair assigned one of these bonds, which became payable on that day, to Muller, but did not assign the mortgage. It is true, that in the· argument of one of the counsel for Hancock, it is contended that this bond was never legally assigned to Muller, but the fact of the assignment is found by the referee and affirmed by the Circuit decree, and there being no exception to such finding, it is conclusive here. On January 10th, 1856, Bauskett sold and conveyed the land to Hancock, and, to secure the payment of the purchase money, took his bonds, secured by ·a mortgage of the premises, which was likewise duly recorded. On March 21st, 1863, Hancock contracted, in writing, to sell and convey fifteen hundred acres of the land to Rhett, for the particular terms of which agreement reference must be had to ·the copy set out in the " case." Under this contract Rhett went into possession, but no titles were ever made to him, and he never paid the purchase money, though it is insisted that the ·purchase money was tendered and refused; nor did he ever give, ·or offer to give, the bonds and mortgage to secure the payment of the purchase money provided for in the agreement. On April 14th, 1863, Fair made an endorsement on the mortgage held by him in the following words : " The lien and legal effect ·of the within mortgage is hereby released and discharged for-· ·ever." (Signed) " Samuel Fair, for Fair & Marshall." This endorsement was recorded in the same office in which the mort-·gage was recorded, but whether at the same place in the record ·book, or whether reference was made from one to the other does not appear. On January 19th, 1864, Rhett contracted, in writ-ing, to sell and convey to Arthur and Johnston the said fifteen hundred acres in consideration of the sum of $50,000, then paid in cash. After this contract was made, but exactly at what date ·does not appear, Rhett offered to pay Hancock, in confederate money, the amount which he had contracted to pay him for the land, which Hancock refused to receive. Arthur and Johnston ·went into possession of the land immediately after their contract with Rhett, and they and their heirs have since continuously remained

in possession—Arthur having died February 27th, 1868, and Johnston April 20th, 1869. The remainder of the land was subsequently sold for taxes assessed against Hancock, and is now held by his son-in-law, Sims, under a tax title. Bauskett having paid all the bonds given by him to Fair and Marshall, except two, one of which was held by Muller, and the other by Fair, filed the original bill in this case on February 18th, 1867, against Hancock, Rhett, Arthur and Childs, who was then supposed to be the owner of Johnston's interest, for a foreclosure of the mortgage given by Hancock to him. Bauskett died sometime during the year 1867, and, subsequently, a bill of revivor was filed by the plaintiff, as his executor, to which the executors of Arthur, who had also died, were made parties. In April, 1871, Muller brought suit against Wadlington, who was the surety of Bauskett on the bond assigned to him by Fair, and, having recovered judgment against him, assigned to Wadlington, on October 9th, 1874, all his right, title and interest in the mortgage given by Bauskett to Fair and Marshall, and subsequently, to wit, on April 13th, 1875, Wadlington paid to Muller the amount of the judgment recovered against him as surety for Bauskett. On June 30th, 1875, the plaintiff, by leave of the court, filed an amended complaint making as additional parties the heirs of Arthur, the heirs of Johnston, (who, as it had been in the meantime ascertained, had not transferred his interest to Childs,) and Wadlington, who claimed the right to enforce the mortgage given by Bauskett to Fair and Marshall to the extent of the amount paid by him as surety of Bauskett upon one of the bonds secured by said mortgage.

Wadlington, by paying the bond on which he was surety, became subrogated to all the rights of Muller, who, as assignee of one of the bonds, was, in equity, also the assignee of a proportionate part of the mortgage, with Fair as his trustee. *Muller* v. *Wadlington*, 5 *S. C.* 343. See, also, 1 *Jones on Mortgages*, § 822, where it is said that this is the generally received doctrine. This proceeding may, therefore, be regarded as an action by a junior mortgagee to foreclose his mortgage, brought against the mortgagor and those claiming under him, to which the senior mortgagee has been made a party with a view to the adjudica-

·tion of his rights also, and the enforcement of any lien which he may be able to establish.

There can be no doubt but that Hancock, at the time he purchased from Bauskett, took his title subject to the encumbrance of the Fair mortgage, which was duly recorded, and, therefore, notice to the world; and there is as little doubt that those who claim under him have no higher rights than he has, unless they can sustain their claim by adverse possession, or as purchasers for valuable consideration without notice of the equity set up by Wadlington as senior mortgagee, which will be hereinafter considered. If Hancock took his title thus encumbered, at the time he obtained it, has anything subsequently occurred to remove that encumbrance? The endorsement made by Fair on the mortgage could not have that effect so far as the assignee, Muller or Wadlington, is concerned, for that was made long after the conveyance to Hancock, and could not, therefore, have formed any part of the inducement to or consideration for the purchase by him from Bauskett. As is said in 2 *Jones on Mortgages*, § 957: "An entry of satisfaction by a mortgagee, after he has parted with his interest in the security, will not discharge the mortgage in favor of one who acquired an interest in the land before the discharge was made. He is no worse off than he supposed himself to be when he acquired his interest, and there is no reason, in equity, why the person really entitled to the mortgage should not have the benefit of it so far as he is con-·cerned." So far then as Hancock is concerned, the endorsement made by Fair on the mortgage was a nullity, except, perhaps, as to any interest which Fair then retained in the mortgage, as to which we are not now called upon to express any opinion. The same is true as to Rhett, who made his contract for the pur-·chase of the land before the endorsement was placed upon the mortgage. But, in addition to this, Fair, as trustee, could not ·release a lien intended for the benefit of his *cestui que trust*, and, if he did so, it would be a breach of trust, in which all persons who had actual notice of the trust, or of such facts as would put them on the inquiry, would be regarded as participants, and ·could therefore claim no benefit from it. Here the mortgage, which was spread upon the records, not only gave notice to the

public that there was a lien upon the land, but that such lien was for the benefit of two persons, and was intended to secure the payment, not merely of one but of seven separate bonds. The fact that seven bonds were given instead of one, payable in seven installments, pointed very naturally to the conclusion that the object was to make use of these bonds separately by a transfer of them. Common prudence would therefore suggest to a purchaser the propriety of an inquiry as to whether all of the bonds had been paid, or the lien to secure their payment properly released, and such inquiry would have led to the discovery of the fact that one of these bonds had been transferred to a third person, and that, therefore, Fair had no right to release the lien of the mortgage so far as that bond was concerned. It is clear, therefore, that Hancock held the legal title, subject to the encumbrance of the Fair mortgage, and whatever rights he may have in the land can be subjected to the payment of the amount which Wadlington has been compelled to pay as the surety of the original mortgagor, Bauskett. What his rights are will next be considered.

Under his contract with Rhett, the latter stood in the position of mortgagor to Hancock as mortgagee, and Rhett could not therefore convey the land, free of such encumbrance, to Arthur and Johnston, unless the mortgage debt, as it might be called, was satisfied by payment, or the lien of the mortgage discharged or released. There is no pretence that such debt was ever, in fact, paid, but it is contended that the lien was discharged by a tender. There is no doubt but that a tender of the mortgage debt at the time it is due discharges the lien of the mortgage, though it does not extinguish the debt; and it will, therefore, be necessary to inquire whether Rhett ever made such a tender to Hancock. Assuming that he offered to Hancock the full amount of the purchase money in confederate treasury notes, this cannot be regarded, legally, as a tender, for such notes never were made a legal tender. The written contract did not provide for the payment of that kind of currency, and while it is quite true that parol evidence may be resorted to for the purpose of showing that the contract was made with reference to confederate treasury notes, as a basis of value, with a view to determine the

actual value to be paid, we know of no authority which authorizes it to be received for the purpose of showing that the offer of such currency would amount to a legal tender of the debt and produce the legal consequences of such a tender. A contract which is proved to have been made with reference to such a currency may be discharged by the payment *in actual money* of the amount which the number of confederate dollars mentioned in it may be proved to have been worth at the time the contract was made, or a creditor may, *if he chooses,* accept payment in confederate treasury notes, and if he does so it will discharge the debt, upon the principle that anything accepted as payment will operate as such ; but it is a very different thing to say that a creditor can be compelled to accept anything in payment of his debt except actual money, or that if he refuses he will be saddled with the consequences attendant upon a refusal to accept a legal tender of his debt. But, in addition to this, the offer of $27,000 in January, 1861, could not, in any view of the matter, be regarded as a tender of the amount secured by the contract made in March, 1863, as the currency was constantly depreciating in value. Rhett, therefore, occupies the position of one who has contracted to purchase but who has not received a title, nor has he paid or tendered the purchase money.

The position of Arthur and Johnston will next be considered. They bought from Rhett, whom they knew at the time had no title, and no right to demand a title until he had complied with the terms of his agreement with Hancock, which he has never done. If they paid the purchase money to him and went into possession under a mistaken reliance upon the effect of what is claimed to have been a tender by Rhett to Hancock they must bear the consequences of their own mistake. They bought land which, as the records showed, was encumbered by two mortgages, from a person whom they knew had no title at the time, and they took the risk of showing that the land had been relieved from both of these mortgages, and that their vendor would acquire a title, or be able to show himself entitled to demand one. Have they done so ? First, as to the Fair mortgage. It is very certain that the debt secured by this mortgage has never yet been fully paid, and it is not so pretended ; but it is con-

tended that the land has been discharged from the lien of the mortgage by the endorsement placed upon it by Fair. Assuming that Fair, as one of the joint mortgagees, could, by this endorsement, without any consideration, so far as appears, release the lien of the mortgage, he certainly could not thereby affect the rights of his assignee, Muller, or Wadlington, who now stands in the shoes of Muller. And though their right to the mortgage may be nothing more than an equity, yet it is an equity long prior in point of time to any equity which Arthur and Johnston can lay claim to, and is, therefore, the superior right. For it will be remembered that Arthur and Johnston (passing by for the present their claim of title by adverse possession) have not got the legal title and can only claim an equity. The question as to whether the land has been relieved from the second mortgage—that of Hancock to Bauskett—depends upon other considerations which must be the subject matter of further inquiry. It is quite clear, as we have seen, that Rhett, the immediate vendor of Arthur and Johnston, has not only never acquired the legal title, but has never placed himself in a position to demand such title, as he has never paid or tendered the purchase money, nor has he ever offered, nor does he now offer to comply with the terms of his agreement. It follows, therefore, that the land in the possession of Arthur's and Johnston's heirs must be subject to these various encumbrances, unless they can make good their claim to hold by adverse possession, or as purchasers for valuable consideration without notice.

As to the claim by adverse possession, we agree with the Circuit judge that it cannot be sustained ; first, because there is no proof of the adverse character of the possession, and, next, because the possession was not for a sufficient length of time. Since the case of *Norton* v. *Lewis*, 3 *S. C.* 25, affirming the previous case of *Wright* v. *Eaves*, 5 *Rich. Eq.* 81, it must be regarded as the settled law of this state that the mere fact of the possession of land covered by a mortgage, for the statutory period, by a purchaser from the mortgagor, with notice of such mortgage, will not constitute a bar to the action for foreclosure. Here the only thing relied upon to show the adverse character of the possession of Arthur and Johnston, as against the Fair

mortgage, is the endorsement placed upon it by him. How that act, in which Arthur and Johnston had no participation, and which was done some time before they claim to have acquired any interest and before their possession commenced, can be said to give any character to their possession, it is difficult to understand. But, even giving it all the efficacy claimed for it, how can it affect Muller or Wadlington, who knew nothing about it—the former until 1871, and the latter until the fall of 1867 or spring of 1868, and dating from either of these periods the possession would be less than the ten years required by the statute before Wadlington was made a party to this action.

The fact that this endorsement was spread upon the records could not operate as constructive notice, because it was not such a paper as, by law, was required to be recorded, and, therefore, the recording of it would not operate as notice. *Harper* v. *Barsh*, 10 *Rich. Eq.* 149. The statute which is relied upon to show that this was a paper proper to be recorded, (*Act of* 1817, 6 *Stat.* 61; *Gen. Stat., Ch. LXXXII., p.* 427,) provides: "That each and every person who shall have received full payment or satisfaction, or to whom a legal tender shall have been made, of his or their debt, damages, costs and charges, secured by mortgage of real estate, shall, at the request of the mortgagor * * * enter satisfaction in the proper office on such mortgage, which shall forever thereafter discharge and satisfy the same." It will be observed that this provision applies only where full payment or satisfaction *of the debt,* secured by the mortgage, has been made, or where there has been a legal tender *of such debt,* and to extend it to anything else would be an unwarrantable addition to the terms of the statute. The doctrine of constructive notice, by recording, is not to be extended to all papers which are in fact recorded, but only to those which are authorized or required to be recorded. 1 *Story's Eq. Jur.,* § 404. As there is no statute which authorizes or requires such a paper as the endorsement in question to be recorded, the fact that it was put upon the record will not make it constructive notice. We see no evidence, therefore, that gives to the possession of Arthur and Johnston a character adverse to the Fair mortgage, and

certainly none that give it such a character as against the mortgage from Hancock to Bauskett.

But in addition to this, we do not think the possession was of a sufficient length of time to bar the action for foreclosure even of the Fair mortgage. The right to bring this action was suspended by the stay law until December 21st, 1866, and from that time to July, 1875, when Wadlington was made a party, the ten years had not elapsed. Certainly, as against the Hancock mortgage, the statutory period had not elapsed before the commencement of the action to foreclose that mortgage.

Nor do we think that Arthur and Johnston can successfully maintain their claim as purchasers for valuable consideration without notice. For, to say nothing of the effect of their failure to plead this defence in the manner required by law, it is manifest that they have not got the legal title, and, at most, only an equity to demand title, and that though they may have paid the purchase money to their immediate vendor, whom they knew did not have the legal title, yet the purchase money has never been paid or tendered to Hancock, the person whom they knew did hold the legal title. As is said by Dunkin, Ch., in *Bush* v. *Bush*, 3 *Strob. Eq.* 134: "The protection of a purchaser for valuable consideration stands on this, that he has *bona fide* acquired the legal title and paid the purchase money before notice of the plaintiff's equity. If he has acquired the legal title but has not paid the purchase money before notice, his plea fails. So, if he has paid the purchase money, but has acquired no legal title, and then receives notice of the plaintiff's equity, he cannot defeat that prior equity by procuring the legal title." And, as is said by Marshall, C. J., in *Vattier* v. *Hinde*, 7 *Pet.* 271: "The rules respecting a purchaser, without notice, are framed for the protection of him who purchases a legal estate and pays the purchase money, without knowledge, of an outstanding title. They do not protect a person who acquires no semblance of title. They apply fully only to the purchaser of the legal estate. Even the purchaser of an equity is bound to take notice of any prior equity." For, as is said by the same distinguished judge in *Boone* v. *Chiles*, 10 *Pet.* 210: "It is a general principle in courts of equity that where both parties

claim by an equitable title, the one who is prior in time is deemed the better in right." Again, at page 211, speaking of the protection afforded *bona fide* purchasers, without notice against a prior equity, says such an equity "can be barred or avoided only by the union of the legal title with an equity, arising from the payment of the money and receiving the conveyance without notice and a clear conscience." In view of these authorities it is very clear that Arthur and Johnston cannot maintain their claim as purchasers for valuable consideration without notice of the prior equity of Muller or Wadlington.

As to the mortgage from Hancock to Bauskett, we propose to say but little, as we agree with the Circuit judge that the questions whether anything, and if so, how much, is still due thereon, should be recommitted to the master, as the conclusions of the referee, based upon the incompetent testimony derived from the declarations of Arthur, and Hancock's testimony as to transactions with the deceased Bauskett cannot be sustained. We think, however, that the whole matter in reference to this mortgage, including the question whether Bauskett, by his conduct or declarations, induced Arthur and Johnston to purchase by holding out to them the idea that the debt due him by Hancock was paid, or that the lien of the mortgage would be released, should be left open with liberty to all parties to introduce any competent testimony as to all these matters, allowing all proper credits to Hancock at their value in legal currency, unless the testimony to be adduced shows that there was an agreement between Hancock and Bauskett that the various articles furnished were to be credited on the mortgage debt at their value in confederate money at the time they were delivered. The discount claimed on account of the amount alleged to have been collected by Bauskett on the Lewis note must be further inquired into, as we do not think the testimony adduced sufficient to establish the claim. As to the discount claimed on account of the Kirkland note, that also must be the subject of further inquiry. There is no doubt but that the claim of a surety for indemnity against the principal is founded, not upon contract, but upon a principle of natural equity and justice. This equity springs up at the time the relation is entered into, and consummated when the surety

pays the debt. Hence, as the Circuit judge has held, a mort-gagee will not be permitted, in equity, to foreclose his mortgage against his surety without allowing such surety the benefit of a credit for any amount which he may have actually paid for such mortgagee; but the surety can only claim the benefit of such credit to the amount actually paid by him. If he has com-promised the debt he can only claim the amount of such com-promise—in other words all he can claim is indemnity—nothing more. See the American notes to the case of *Dering* v. *Earl of Winchelsea*, 1 *W. & T. Lead. Cas. in Eq.* 105, where these principles are laid down and fully supported by the cases there collected. The inquiry, therefore, in this case should be what is the amount which Hancock has actually, not nominally, paid on the Kirkland bond, and for such amount he is entitled to have credit. The mere fact of giving a note or due-bill for the whole amount of the bond is not sufficient without proof that he has paid or has the means to pay it. A mere pretensive pay-ment would certainly constitute no foundation for the equity upon which the claim must rest. The case of *Peters* v. *Barnhill*, 1 *Hill* 234, which has been relied upon to support a contrary view, was an action at law, and cannot be regarded as controll-ing this case. As to the ground taken by the counsel for the plaintiff that a payment made by a surety after the death of the principal cannot, in an action by the executor of the principal, be set off against an obligation given by the surety to the prin-cipal, we do not think it can be sustained; for, besides being directly opposed to the decision in *Hinds* ads. *David, Harp.* 423, the proposition contended for manifestly rests upon the idea that the claim of the surety is founded upon contract, which as we have seen, is not the case, but that on the contrary, it rests upon an equity which springs up when the relation of principal and surety is entered into, and is consummated when the surety pays the debt; and that it is upon a principle of equity rather than as a set-off that the principal will not be permitted to enforce the payment of a debt or the foreclosure of a mortgage in disregard of such equity.

The order of sale ignores the fact that the mortgaged premises are now held by different persons, under different claims acquired

at different times. When such is the case the rule is that the several parcels shall be sold in the inverse order of the sales made by the mortgagor. *Norton* v. *Lewis*, 3 *S. C.* 25. The order of sale must, therefore, be modified so that the tract held by Sims should be first sold, and if the proceeds of such sale should be insufficient to satisfy the various liens which have or may be established, together with the costs, then the remainder of the land in the possession of the heirs of Arthur and Johnston should be sold.

The judgment of the Circuit Court, except as modified herein, is affirmed, and the case is remanded to that court for such further proceedings as may be necessary.

WILLARD, C. J., and McGOWAN, A. J., concurred.